MODIFIED OPINION[1]

NOT DESIGNATED FOR PUBLICATION

No. 128,336

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOHN DAVID BEE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Riley District Court; GRANT D. BANNISTER, judge. Oral argument held April 14, 2026. Original opinion filed June 18, 2026. Modified opinion filed August 14, 2026. Reversed and remanded.

*Bryan Cox and Jonathan Sternberg*, of Jonathan Sternberg, Attorney, P.C., of Kansas City, Missouri, for appellant.

*David Lowden*, deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before COBLE, P.J., HURST, J. and PAULA HOFAKER, District Judge, assigned.

PER CURIAM: John David Bee was convicted of 17 out of 27 misdemeanor counts of violating a protective order following a jury trial in Riley County District Court. On

---

[1] **REPORTER'S NOTE**: Opinion No. 128,336 was modified by the Court of Appeals on August 14, 2026. Appellant's motion for rehearing filed July 2, 2026, is denied. The modified language appears at slip op. 1-2, 7, 10, 19-21.

appeal, Bee claims multiple trial-level errors occurred. This court finds that venue was proper in Riley County and evidence was sufficient to support venue. Any delay that occurred did not amount to a violation of the defendant's constitutional right to a speedy trial, and sufficient evidence was presented of the protective order. However, the district court abused its discretion when it denied Bee's motion for a bill of particulars. Accordingly, we reverse his convictions and remand the case.

FACTUAL AND PROCEDURAL BACKGROUND

John David Bee and Kimberly Bee were a married couple residing in Kansas. Hereinafter, John David Bee is referred to as "Bee" and Kimberly Bee is referred to as "Kimberly." The couple has one child. In 2021, Kimberly filed a petition for an order of protection from abuse (PFA) and Bee filed a petition for divorce, all in Riley County, Kansas. Kimberly was represented by an attorney in both matters, and Bee was self-represented.

In May 2022, the couple finalized their divorce, and Kimberly attempted to secure a final PFA against Bee, which had temporarily been in place since 2021. The Riley County District Court heard both cases over 2 days, including nearly 11 hours of "pretty dense testimony and data with really all issues contested." The district court issued final orders in both cases. The court awarded primary residential custody of their child to Kimberly and granted Bee parenting time on three Sundays per month. The court also granted Kimberly's petition and entered a PFA order that would be in effect for one year.

The PFA order prohibited Bee from having contact with Kimberly with exceptions for discussions through the TalkingParents app pertaining to parenting time, exchange of their child, and for purposes of exchanging personal property ordered in the divorce case. Under the order, Bee was prohibited from assaulting, threatening, abusing, harassing,

2

following, stalking, or interfering with Kimberly. The written order was served on Bee at his then-residence in Ogden, Riley County, Kansas, on June 22, 2022.

Bee and Kimberly exchanged hundreds of messages from May 2022 to May 2023, during which time the PFA order was active. On January 23, 2023, Kimberly made a complaint to the Riley County Police Department, alleging Bee was violating the PFA order.

On May 23, 2023, the State filed a complaint/information charging Bee with one count of violating a protective order in violation of K.S.A. 21-5924(a)(1), a class A misdemeanor, "on or between the 27th day of May, 2022 and the 22nd day of January, 2023, in Riley County, Kansas." When Bee was arrested and then subsequently bonded out of jail, he indicated his home address was in Abilene, Kansas.

On August 16, 2023, Bee appeared, with counsel, before the district court for his first appearance. He entered a not guilty plea, and the court set his case for a status hearing on September 5, 2023. On September 4, 2023, Bee's counsel filed a motion requesting the court to grant production of a transcript of the final order in the PFA case. At the status hearing on September 5, Bee's counsel requested another status hearing so that the transcript could be produced. The status hearing was held on October 30. On October 30, Bee's counsel requested the case be set over until November 13 due to ongoing plea negotiations. On November 13, Bee demanded a jury trial, and the trial was set for February 13, 2024. Plea negotiations failed and on January 18, 2024, the State filed an amended complaint charging Bee with 27 separate counts of violating a protective order in violation of K.S.A. 21-5924(a)(1). Each of the counts alleged a violation "on or about" a particular date ranging from June 1, 2022, to May 23, 2023. Bee moved for a bill of particulars pursuant to K.S.A. 22-3201(f). At a hearing on February 2, 2024, the district court found the amended complaint was adequate and denied the motion for a bill of particulars.

3

On February 8, 2024, the State moved to continue the jury trial due to one of the State's attorneys contracting COVID-19. Over the defense's objection, the court granted the continuance and reset the case for trial on April 2, 2024. The court noted that "[a]ny applicable speedy trial time shall be charged to the State." That trial setting was also canceled, and the case was set for a status conference on April 22, 2024. At that conference, the trial was again set for July 3, 2024.

On July 2, 2024, the eve of trial, Bee moved to dismiss the case against him for violation of his right to a speedy trial, arguing that 252 days of delay were attributable to the State. Before voir dire on July 3, 2024, the court denied the motion and declined to rule on the amount of speedy trial time chargeable to the State.

The case was tried in a single-day jury trial on the 27 misdemeanor counts. At trial, a former law enforcement employee testified that on June 22, 2022, he served a copy of the PFA order on Bee at his home in Ogden, Riley County, Kansas.

Kimberly testified about the PFA order and her understanding of its content. Kimberly explained that Bee was only allowed to communicate with her about her son on the TalkingParents app. As she understood it, the app was specifically for discussing the exchange of property that was discussed in their divorce and for discussion about things involving their minor child, such as behaviors, potty training, how they were doing things, and coparenting. Kimberly described how the TalkingParents app worked: a user can set up a topic for a conversation, such as "potty training," and messages from each parent would show up there and trigger a notification email to the other user. Each message would be time-stamped when one user sent it and when the other user opened it.

After some discussion about the app, the court admitted State's Exhibits 1-27. These exhibits contained excerpts of TalkingParents messages corresponding to the dates in the respectively numbered counts of the amended complaint. For example, Exhibit 1

4

contains messages time-stamped on June 1, 2022, which is the same date charged in Count 1 of the amended complaint. For some of the charged counts, there are multiple sub-exhibits. For example, there is no Exhibit 7, but Count 7 is represented by Exhibits 7.1 and 7.2, which each contain a message dated October 8, 2022.

At the close of the State's evidence, the defense moved for judgment of acquittal and argued that the State had failed to present evidence to establish venue in Riley County pursuant to K.S.A. 22-2619 which sets forth rules specifically dealing with crimes committed with an electronic device. Bee's counsel asserted that the TalkingParents app was accessible only through a computer, phone, or tablet. The district court denied the motion for judgment of acquittal, stating that it was an "open question" if that venue statute applied to the case.

Bee testified that he understood the PFA permitted communication "as long as it was about [their child] and it was respectful" and that he agreed with Kimberly's belief that permitted communication included parenting matters and property exchanges. Bee admitted that he had sent the messages reflected in State's Exhibits 1-27 but explained that they were not the entirety of the conversations between himself and Kimberly. He explained that his messages needed to be understood in the context of hundreds of messages, which were organized under multiple different topic threads. Bee said that where the prosecution said a one-off message seemed "irrelevant" and "a rant," you had to have the full transcript. He said Kimberly would skip from topic to topic, and he would simply respond to the latest message while he was at work.

The State cross-examined Bee about the messages, beginning by introducing Exhibit 30, the full 136-page transcript of the messages between Bee and Kimberly on the TalkingParents app, and it shows the topic headers under which messages are organized. The district court admitted the exhibit. Bee insisted that he could not remember the context or reasoning for all the messages he sent to Kimberly years ago.

Bee said that one would have to look at the entire conversation to understand his response and that it was not harassment.

The State elicited testimony from Bee that he had lived in places other than his house during the relevant period, including "[w]ith girlfriends." Bee stated that he was living in Odgen, Riley County, Kansas, during June 2022 and that he owned his residence there. He explained that during August 2022, he resided at his Ogden house "[s]ometimes." He testified that he owned the house at the time of the divorce and still owned the house at the time of trial, but he moved out sometime around February 2023 and relocated to Abilene. He also stated that the Ogden home was "[s]ometimes" but not always his primary residence. Bee said that the Ogden residence was reserved for his son's toys, and that is where Bee brought their child when he had parenting time. Other than that, Bee would typically stay somewhere else.

At the close of all the evidence, the defense renewed the motion for judgment of acquittal. The defense argued that the State failed to prove that any of the requisite acts of the offenses were conducted in Riley County. After discussion, the district court reserved ruling on the motion as to all 27 counts.

The jury returned a verdict of not guilty on 10 of the charges and found Bee guilty on 17 of the charges. The court reserved entering judgment based on the verdicts until it could complete additional research and decide the defense's motion.

Six days after trial, the district court held a hearing at which it denied the motion for judgment of acquittal. The court reasoned that the PFA order's issuance in Riley County was a "requisite act giving venue for the Riley County District Court" under either K.S.A. 22-2619(b)(1) or K.S.A. 22-2603. The court also entered judgment against Bee based on the jury's verdicts as to each count. Bee was sentenced to 12 months in the county jail on each of the 17 counts—5 counts to run consecutive and the remaining 12

counts to run concurrent. His sentence was suspended and he was placed on 12 months of supervised probation after he served 30 days in the county jail.

Bee timely appealed.

ANALYSIS

*Venue was proper in Riley County, and evidence was sufficient to support jury's venue finding.*

On appeal, Bee argues the district court erred in denying his motion for judgment of acquittal because the State presented insufficient evidence to prove venue was proper in Riley County. The parties do not dispute the applicable standard of review to a denial of a motion for judgment of acquittal. In reviewing a district court's decision to deny a defendant's motion for a judgment of acquittal, the appellate court will consider all the evidence in the light most favorable to the State and determine if a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. In doing so, the appellate court will not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *State v. Frantz*, 316 Kan. 708, 736, 521 P.3d 1113 (2022). To the extent that the analysis requires interpretation of the venue statutes, this court's review is unlimited. See *State v. Alvarez*, 309 Kan. 203, 205, 432 P.3d 1015 (2019) ("We review issues of statutory interpretation de novo.").

While Bee's appeal was pending, the Kansas Supreme Court clarified that "venue is not a jurisdictional matter, but a procedural one." *State v. Barnes*, 320 Kan. 147, 158-59, 563 P.3d 1255 (2025). The proper venue for a prosecution is set by the Legislature through statute. 320 Kan. at 159 (citing as examples K.S.A. 22-2602; K.S.A. 22-2603; K.S.A. 22-2604). Venue is a necessary fact that must be proven by the State. 320 Kan. at 159.

7

The Kansas statutes governing jurisdiction and venue for criminal prosecutions are found in Article 26 of the Kansas Code of Criminal Procedure. Generally, the proper venue for a criminal prosecution "shall be in the county where the crime was committed." K.S.A. 22-2602. However, when "two or more acts are requisite to the commission of any crime and such acts occur in different counties the prosecution may be in any county in which any of such acts occur." K.S.A. 22-2603. Additionally, when a crime is committed with an electronic device, venue is also proper in the county in which: "(1) Any requisite act to the commission of the crime occurred; (2) the victim resides; (3) the victim was present at the time of the crime; or (4) property affected by the crime was obtained or was attempted to be obtained." K.S.A. 22-2619(b).

Whether venue is proper is a question of fact for the jury. *State v. Calderon-Aparicio*, 44 Kan. App. 2d 830, 837, 242 P.3d 1197 (2010). "'Venue may be established by proof of facts and circumstances introduced in evidence from which the place or places of commission of the crime or crimes may be fairly and reasonably inferred.'" 44 Kan. App. 2d at 837. "'If an inference is a reasonable one, the jury has the right to make the inference.'" *Frantz*, 316 Kan. at 736; see also *State v. Thomas*, No. 127,235, 2026 WL 631148, at *4 (Kan. App. 2026) (unpublished opinion) (noting the same and considering the sufficiency of evidence supporting venue).

When the district court ultimately denied Bee's motion for judgment of acquittal, it reasoned that an "act" for the purposes of the protective order violation included the issuance of the order itself in Riley County. The district court found support for its reasoning in an unpublished opinion of this court, *State v. Briones*, No. 119,760, 2019 WL 3980652, at *6-7 (Kan. App. 2019) (unpublished opinion). The State argues that this court should follow the same rationale set forth in *Briones*.

In *Briones*, a panel of this court considered an appellant's claim that under the Kansas venue statutes, the Johnson County District Court was not the proper venue for

8

his prosecution for unlawfully tampering with electronic monitoring equipment because the tampering occurred in Wyandotte County. The panel found that the commonly recognized "'elements'" of a crime are synonymous with the "'acts'" requisite to the commission of a crime that trigger venue within a county. 2019 WL 3980652, at *6. One of the elements of unlawful tampering with electronic monitoring equipment was that the equipment was being used as a condition of court ordered supervision of Briones in Johnson County. So, under K.S.A. 22-2603, which allows prosecution in any county in which any acts "'requisite to the commission'" of a crime occurred, the court found Johnson County was a proper venue to prosecute Briones, because a necessary part of the crime occurred in Johnson County. 2019 WL 3980652, at *6. The panel found that the charge of electronic monitoring equipment was a "'direct outgrowth'" of the Johnson County criminal case in which Briones was ordered to wear the electronic monitoring device, because Briones' removal of that device was an attempt to escape being monitored for pending criminal cases in Johnson County. 2019 WL 3980652, at *7.

In *Briones* the court held:

"Under K.S.A. 22-2603, when two or more acts are required to commit a crime, the prosecution may be in any county where at least one of the acts occurred. Kansas appellate decisions are clear that a requisite act to trigger venue is not restricted to the physical act of committing the crime. Here, the fact that the electronic monitoring equipment was being used as a condition of court ordered supervision in Johnson County was a requisite act to the commission of the crime for which Briones was convicted. As a result, we conclude that Johnson County was a proper venue to prosecute Briones for unlawfully tampering with electronic monitoring equipment. Based on this conclusion, we need not address the State's alternative argument that K.S.A. 2018 Supp. 22-2619 provides venue to prosecute Briones in Johnson County." 2019 WL 3980652, at *7.

K.S.A. 21-5924(a)(1) defines violation of a protective order as "knowingly violating:  . . . [a] protection from abuse order issued pursuant to K.S.A. 60-3105, 60-

9

3106, or 60-3107, and amendments thereto." Applying the same logic in this case as in *Briones,* this court finds the fact that the PFA order Bee violated was issued in Riley County, was a "requisite act to the commission of the crime" for which Bee was convicted. K.S.A. 22-2619. In other words, Bee could only violate the protection from abuse order by sending messages because of the existence of the PFA order, which was issued in Riley County. Therefore, Riley County was a proper venue to prosecute Bee for violation of a protective order. Furthermore, the evidence was sufficient to support the conclusion that the "act" which must have occurred in Riley County was the issuance of the PFA order.

*The district court abused its discretion in denying Bee's motion for a bill of particulars.*

Prior to trial, Bee filed a motion requesting the district court to order the State to furnish him with a bill of particulars. The court denied the motion in a hearing in February 2024.

On appeal, Bee approaches this issue from two angles. He primarily argues that because the State's complaint did not identify the specific messages or the State's legal theory for how those messages violated the PFA order, the complaint was legally insufficient, and the district court was legally required to order a bill of particulars. He asserts that this court should analyze the sufficiency of the charging document de novo. Bee argues that this court should review the district court's decision to deny the bill of particulars for an abuse of discretion only if it finds that the charging document was legally sufficient on its own.

K.S.A. 22-3201(f) establishes the procedure required to seek a bill of particulars:

"(f) When a complaint, information or indictment charges a crime but fails to specify the particulars of the crime sufficiently to enable the defendant to prepare a

10

defense the court may, on written motion of the defendant, require the prosecuting attorney to furnish the defendant with a bill of particulars. At the trial the state's evidence shall be confined to the particulars of the bill."

"The decision to require the prosecution to file a bill of particulars is discretionary with the trial court except in such cases where the charging instrument itself is insufficient to inform the accused of the charge against which he or she must defend." *State v. Webber*, 260 Kan. 263, 284, 918 P.2d 609 (1996).

In *State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016), the Supreme Court established the current method of evaluation for charging document defects. Because evaluation of charging document defects involves the interpretation of statutes, constitutional provisions, and written instruments, the standard of review for such challenges raised on appeal is de novo. 304 Kan. at 819. The problem for Bee is that he did not argue to the district court that the charging document was constitutionally insufficient before trial.

Even if Bee properly brought an argument that the State's amended complaint was constitutionally insufficient, the argument would have no merit. A charging document must contain "a plain and concise written statement of the essential facts constituting the crime charged." K.S.A. 22-3201(b); *State v. Rojas-Marceleno*, 295 Kan. 525, 533, 285 P.3d 361 (2012). A charging document is generally sufficient if it is "drawn in the language of the statute," and "[t]he precise time of the commission of an offense need not be stated in the indictment or information; but it is sufficient if shown to have been within the statute of limitations, except where the time is an indispensable ingredient in the offense." K.S.A. 22-3201(b); *Rojas-Marceleno*, 295 Kan. at 533-34. The State's complaint met this standard. Thus, the district court had discretion to order the State to provide a bill of particulars. This court reviews the district court's order denying the motion for a bill of particulars for an abuse of discretion. *Rojas-Marceleno*, 295 Kan. at

11

533. A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021).

On appeal, Bee argues the district court erred in denying his request for a bill of particulars because the charging instrument was insufficient to inform him of the charges and allow him to prepare a defense. Specifically, Bee asserts (1) the charging document failed to specify what act or acts the State alleged violated the PFA order, including whether that act was an in-person interaction, a message outside of the TalkingParents app, or a message within the TalkingParents app; and (2) he had no way to know the State's theory for how a particular message violated the PFA order, which allowed some contact.

Bee correctly notes the functions served by a bill of particulars: "'(1) to inform the defendant of the nature of the charges and the evidence to enable him [or her] to prepare a defense, and (2) to prevent further prosecution for the same offense.'" *Rojas-Marceleno*, 295 Kan. at 534. Here, as Bee points out, the State's amended complaint contains 27 counts against Bee which, other than having unique dates, are worded identically. Each count states the following:

> "That on or about [DATE] in Riley County, Kansas, JOHN DAVID BEE did unlawfully and knowingly violate a protection from abuse order issued pursuant to K.S.A. 60-3105, 60-3106, or 60-3107, and amendments thereto, in Riley County District Court Case No. RL-2021-DM-000066, a class A person misdemeanor, in violation of K.S.A. 21-5924(a)(1) & (b)(1)."

Bee filed his motion for a bill of particulars on January 26, 2024, asserting that the separate dates on each of the counts in the amended complaint were not adequate to allow him to prepare a defense less than a month before the jury trial. On February 1, the State filed a written response indicating that the defense had been provided with full discovery,

12

including the entire transcript of the TalkingParents app messages. The district court held a hearing on February 2, at which the defense focused its concern on the fact that Bee had to guess which messages violated the PFA order for some counts. The district court ultimately denied Bee's motion.

In denying Bee's motion for a bill of particulars, the district court abused its discretion. Though the full TalkingParents app transcript is not endless, it would have allowed Bee to understand the charged offense and theory of violation if the State had at least been required to identify the individual messages at issue. Count 1, for example, was based on messages featured in State's Exhibit 1. In State's Exhibit 1, Bee sent a message to Kimberly on June 1, 2022, asking if she had considered changing her last name back to what was presumably her name before she married him. But a review of the full TalkingParents app transcript shows that Bee sent at least 10 individual messages to Kimberly on June 1, 2022. Some of those messages could easily have fit in among the other messages upon which the State based the other counts. For example, Bee sent a message the same morning that said: "I don't want you to hand [my son] to me anymore. I absolutely do not want any physical contact with you." And a couple of hours later, he sent:

> "I think it's disgusting that you accused me of [a crime] during the trial and then days later use handing me [our child] as an excuse to rub your chest on me. From now on I suggest that the person taking [our child] with them from the exchange will remove [him] from the other person's vehicle and be responsible for putting them in their own."

But neither of these messages were alleged to have been violations of the PFA order. Bee would likely not have been able to accurately guess which of the messages he sent on June 1, 2022, could have formed the basis for the State's allegation in Count 1.

13

This is just the first of 27 total counts—as Bee points out, he sent numerous messages on many of the dates at issue. Count 2 was based on a message Bee sent on June 22, 2022. The TalkingParents transcript contains eight messages sent by Bee that day. Again, some of those messages were not used to prove the charge, but were arguably messages the State could have used to allege violations of the PFA order, making Bee's defense preparation nearly impossible. In one, Bee asks Kimberly: "If you do not send the inhaler with [our child] during parenting time, do you agree to be fully responsible for the subsequent visit to the emergency room for a breathing treatment should the need arise?" He concludes another message from that day with: "Why spoil the little bit of joy he has?" Neither of those messages made it into the messages the State identified as violating the PFA order.

The State argues that it was "clear from the charging document and the mere litigation of the motion for bill of particulars" that the State was relying exclusively on communications between Bee and Kimberly through the TalkingParents app to form the basis of its allegations. However, it is important to remember that the PFA order did not bar all communication between Bee and Kimberly—it explicitly recognized that some communication could occur concerning their child and the exchange of their property. Bee was not committing a criminal act every time he messaged Kimberly through the TalkingParents app. In this case, where there was a lack of specificity as to which messages constituted a criminal act, the bill of particulars should have been granted.

In *State v. Panjada*, No. 125,259, 2023 WL 3143658, at *7-8 (Kan. App. 2023) (unpublished opinion), a panel found that a bill of particulars should have been granted where the State charged the defendant with official misconduct but failed to identify the specific calls and texts to individuals that supported the charge. The defendant in that case, like Bee, was charged with misdemeanors and did not have a preliminary hearing which could have provided her with more details about the charges. See 2023 WL 3143658, at *7; *State v. Robinson, Lloyd & Clark*, 229 Kan. 301, Syl. ¶ 6, 624 P.2d 964

14

(1981) (There is no need for a bill of particulars "[w]hen charges in the information are clarified by facts brought out at the preliminary hearing . . . absent a showing of surprise or prejudice."). Like Panjada, Bee was "left guessing" what acts constituted the crimes charged, as the State failed to specify which evidence was considered a criminal act. 2023 WL 3143658, at *8. There was real ambiguity in this case, like in *Panjada*.

Lastly, the State argues that even if given the bill of particulars, the defense to each of Bee's messages would have been the same—that Bee stayed within the scope of the PFA order and that the State was taking the messages out of context. Reviewing the trial transcript, though, Bee's inability to prepare a specific defense to each message is evident. When the State cross-examined Bee about the individual messages and asked him to explain, Bee said that because messages from the same date were split across topic threads throughout the TalkingParents app transcript, it would take significant time to review the context surrounding each message. If Bee had been told the specific messages underlying each count, he may have been able to assess the context and more effectively prepare his defense prior to trial. Due to the number of charges and the breadth of the PFA, without the bill of particulars, Bee was left without a theory of violation—did he "threaten, abuse, harass, follow, stalk, or interfere"?

We find that when the district court denied Bee's motion for a bill of particulars, Bee was ultimately prejudiced by the lack of specificity in the amended complaint. Because the district court abused its discretion by its arbitrary and unreasonable action in denying Bee's request for a bill of particulars, Bee's convictions for violation of a protective order are reversed.

*The district court did not err when it denied Bee's motion to dismiss for violation of his constitutional right to a speedy trial.*

On July 2, 2024, the eve of trial, Bee moved to dismiss the case against him for violation of his right to a speedy trial, arguing that 252 days of delay were attributable to the State. Before voir dire on July 3, the court denied the motion and declined to rule on the amount of speedy trial time chargeable to the State.

On appeal, Bee argues the district court erred by finding that the State did not violate his constitutional right to a speedy trial despite the passage of 335 days from his arrest on August 2, 2023, to the date of trial on July 3, 2024. He argues that the length of the delay was presumptively prejudicial and that he was prejudiced by the delay because he was unable to interact with their child during the pendency of the case out of fear of being accused of further violations of the PFA order.

On appeal, Bee asserts only his constitutional claim and does not argue that his statutory right to a speedy trial was violated—likely because the Legislature suspended this statutory right during the COVID-19 pandemic. K.S.A. 22-3402(m) ("No time between March 19, 2020, and March 1, 2024, shall be assessed against the state for any reason."). But unlike the Kansas statute requiring a speedy trial, the constitutional speedy-trial provision is "considerably less rigid" and does not create a strict timeframe within which the State must bring a defendant to trial. *State v. Shockley*, 314 Kan. 46, 61, 494 P.3d 832 (2021).

The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." As a matter of law, appellate courts have unlimited review when deciding if the State has violated a defendant's constitutional right to a speedy trial. *Shockley*, 314 Kan. at 61.

Bee argues that the four-point *Barker* balancing test weighs in his favor. See *Barker v. Wingo*, 407 U.S. 514, 530-31, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972); *Shockley*, 314 Kan. at 61-62 (noting Kansas' adoption of the *Barker* test). The *Barker* test provides four factors that courts should assess in determining whether a particular defendant has been deprived of his right to a speedy trial:  Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. *Barker*, 407 U.S. at 530; *Shockley*, 314 Kan. at 62. "Because the test requires a balancing, none of these factors is a necessary or sufficient condition for finding a violation. Instead, we consider them together along with any other relevant circumstances." *State v. Owens*, 310 Kan. 865, 869, 451 P.3d 467 (2019).

The first factor of the *Barker* test is considered a "triggering mechanism" for the other parts of the inquiry:

> "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case." *Barker*, 407 U.S. at 530-31.

Though this analysis is focused on the length of the delay, "whether the length of delay is presumptively prejudicial depends on the peculiar circumstances of each case, and the mere passage of time is not determinative." *State v. Weaver*, 276 Kan. 504, Syl. ¶ 3, 78 P.3d 397 (2003); *State v. Smith*, 320 Kan. 62, 72, 563 P.3d 697 (2025). Our Supreme Court has explained that the "overarching consideration in determining whether the delay is presumptively prejudicial is whether the delay is reasonable given the complexity of the case." *Owens*, 310 Kan. at 875. For example, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker*, 407 U.S. at 531.

17

Here, the parties agree that the length of delay from the time of Bee's arrest to the date of trial was 335 days. In other words, the delay was about 11 months. In *Owens*, the Supreme Court found that a 19-month delay between the defendant's arrest and trial was presumptively prejudicial in a "simple and straightforward case." 310 Kan. at 875. In *Weaver*, the Supreme Court found that a nearly 15-month delay (450 days) from the date of arrest to trial was presumptively prejudicial where the State's case against him was "simple and straightforward." 276 Kan. at 510-12. The Supreme Court noted that Weaver had not been arraigned until 123 days after his arrest, that 299 days passed in which no attempt was made to try him, and that the State's evidence against him was presented in 64 transcript pages of testimony. 276 Kan. at 511.

Bee argues the case here is even simpler than in *Weaver* because it was originally a single count of a violation of a protective order, and even when amended to 27 total criminal counts, the State's case-in-chief was presented in just 62 pages of testimony. However, the delay in this case was more than 100 days shorter than the *Weaver* case, and, as Bee concedes, it involved 26 more criminal counts by the time of trial.

A 335-day delay is not an extraordinarily long one, even for a misdemeanor case. In *State v. Rosine*, 233 Kan. 663, 667-68, 664 P.2d 852 (1983), the Supreme Court found that 254-day delay in one defendant's case and a 296-day delay in another defendant's case were "clearly not presumptively prejudicial." Though the delays in those cases were shorter than the delay here, each involved only one charge of possession of marijuana.

Although defense counsel attributed some of the delay to his own earlier requests for continuance in the case, this court does not concern itself with who caused the delays in assessing whether the length of delay was presumptively prejudicial. *Smith*, 320 Kan. at 72 ("In assessing presumptive prejudice, we are not concerned with who *caused* the delays between the mistrial and the second trial; that analysis would fall under the second *Barker* factor, if we were to reach it."). However, this court does look at the overall

18

circumstances of the case and concludes that the delay was not presumptively prejudicial. Even though the case involved criminal counts of the same nature, there were 27 individual counts for the State to prepare to prove. There were delays caused by plea negotiations, by illness, and by the court's schedule. Here, where the delay was less than one year, this court finds that this was just an ordinary delay, and the length of delay was not presumptively prejudicial. Hence, Bee's constitutional right to a speedy trial was not violated.

*There was sufficient evidence presented as to the protective order to support the defendant's convictions.*

The State introduced the PFA order as Exhibit 28. The PFA order contains a list of specific orders. The third page of the order contains a section labeled, "Housing and Property," which would allow the court to initial applicable provisions and fill in blanks in the provisions. The fourth page contains a similar section labeled, "Parentage, Support, and Custody." The district court did not initial or fill in any blanks on the third or fourth pages. Instead, on both pages, the court wrote: "N/A. Divorce 21DM87 governs." On the fourth page, where it calls for a Child Support Addendum to be attached to the document, the district court also wrote, "Ordered in divorce 21DM87." On the final page of the order, under "Other Provisions," the district court initialed and wrote: "Defendant may communicate with Petitioner by TalkingParents app regarding parenting time + exchange. Also regarding return of property ordered in 21DM87."

On appeal, Bee argues that because the State presented no evidence of the orders in the 21DM87 case, the jury had no basis to fully interpret the PFA order and how it may have changed since the PFA order had been issued. Bee argues that the State thus failed to introduce sufficient evidence to prove that Bee's communications violated the order.

19

Bee raises his claim for the first time on appeal, but "[t]here is no requirement that a criminal defendant challenge the sufficiency of the evidence before the trial court in order to preserve it for appeal." *State v. Farmer*, 285 Kan. 541, 545, 175 P.3d 221 (2008).

> "When a defendant challenges the sufficiency of the evidence, we review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. We do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses." *State v. Mendez*, 319 Kan. 718, 723, 559 P.3d 792 (2024).

The PFA order is a written instrument, and the interpretation and legal effect of written instruments are matters of law over which the appellate court exercises unlimited review. *State v. Keys*, 315 Kan. 690, 697, 510 P.3d 706 (2022) (charging document and statutes); *In re Estate of Einsel*, 304 Kan. 567, 579, 374 P.3d 612 (2016) (interpreting journal entry in earlier divorce proceeding).

Bee's argument focuses on a part of what he calls the "operative no-contact provision" of the order. On the second page of the order, where it provides the basic rules of the order, it states: "Defendant shall not contact the Protected Person(s), either directly or indirectly, in any way, except as authorized by the court in Paragraph 8(b) of this order." As Bee points out, Paragraph 8 is contained on the fourth page of the order—the one governing "Parentage, Support, and Custody." Paragraph 8(b) would allow the court to enter orders related to custody and parenting time. Paragraph 8(b) is not initialed nor are any of the blanks filled out because the district court found that the entire parenting and custody section was not applicable.

On appeal, Bee admits that when the PFA order is construed as a whole and its nature as a form order is considered, the court's intent to qualify the no-contact provision in Paragraph 14 is clear. He argues, however, that it would have been unclear to the jury

whether the orders in the 21DM87 case had changed and how that might impact the PFA order.

Based on the wording of the PFA order, this court concludes that Bee's position is without merit. The references the district court made to the divorce decree were located on parts of the form order that referenced the practical parts of parenting, custody time, finances, and property. The district court indicated that those parts were inapplicable in this case. The reference to Paragraph 8(b) leads one to the section which the district court marked as "N/A"—not applicable—to the case. The district court wrote in a separate provision—Paragraph 14—covering the specific exceptions to the no-contact order.

Bee concedes that this court should construe the PFA order as a whole, but then he asks the court to read something that is not there. Viewed in the light most favorable to the State, a rational fact-finder could have reviewed the PFA order, determined if Bee's messages violated the order or not, and found Bee guilty beyond a reasonable doubt. The omission of the actual divorce decree in 21DM87 is not relevant to whether the State presented sufficient evidence to support the convictions because the jury had all the information necessary to determine Bee's guilt.

Given our decision of error on the district court's failure to require a bill of particulars, this panel does not need to address Bee's challenge to the court's failure to give a unanimity instruction. The convictions are reversed.

Reversed and remanded.

21